UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. NO. 11-30035-MAP |
| | ) |
| RESIDENTIAL FUNDING COMPANY, LLC, et al., | ) ) |
| Defendants | ) |

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. NO. 11-30039-MAP |
| | ) |
| DB STRUCTURED PRODUCTS, INC., et al., | ) ) |
| Defendants | ) |

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. NO. 11-30044-MAP |
| | ) |
| RBS FINANCIAL PRODUCTS INC., et al., | ) ) |
| Defendants | ) |

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. NO. 11-30047-MAP |
| | ) |
| DLJ MORTGAGE CAPITAL, INC., et al., | ) ) |
| Defendants | ) |

```
MASSACHUSETTS MUTUAL LIFE        )
INSURANCE COMPANY,               )
               Plaintiff         )
                                 )
               v.                ) C.A. NO. 11-30048-MAP
                                 )
CREDIT SUISSE FIRST BOSTON       )
MORTGAGE SECURITIES CORP.,       )
et al.,                          )
               Defendants        )
```

```
MASSACHUSETTS MUTUAL LIFE        )
INSURANCE COMPANY,               )
               Plaintiff         )
                                 )
               v.                ) C.A. NO. 11-30094-MAP
                                 )
JP MORGAN CHASE BANK, N.A.,      )
et al.,                          )
               Defendants        )
```

```
MASSACHUSETTS MUTUAL LIFE        )
INSURANCE COMPANY,               )
               Plaintiff         )
                                 )
               v.                ) C.A. NO. 11-30126-MAP
                                 )
GOLDMAN SACHS MORTGAGE COMPANY,  )
et al.,                          )
               Defendants        )
```

```
MASSACHUSETTS MUTUAL LIFE        )
INSURANCE COMPANY,               )
               Plaintiff         )
                                 )
               v.                ) C.A. NO. 11-30127-MAP
                                 )
IMPAC FUNDING CORPORATION,       )
et al.,                          )
               Defendants        )
```

MASSACHUSETTS MUTUAL LIFE       )
INSURANCE COMPANY,              )
              Plaintiff        )
                               )
              v.               ) C.A. NO. 11-30141-MAP
                               )
HSBC BANK USA, NATIONAL        )
ASSOCIATION, et al.,           )
              Defendants       )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS
11-30035-MAP (Dkt. Nos. 22 and 28); 11-30039-MAP (Dkt. No.
17); 11-30044-MAP (Dkt. No. 17); 11-30047-MAP (Dkt. No. 16);
11-30048-MAP (Dkt. Nos. 23 and 27); 11-30094-MAP (Dkt. No.
24); 11-30126-MAP (Dkt. No. 26); 11-30127-MAP (Dkt. No. 10);
11-30141-MAP (Dkt. No. 11)

February 14, 2012

PONSOR, U.S.D.J.


I. INTRODUCTION

Plaintiff Massachusetts Mutual Life Insurance Co.
purchased billions of dollars of residential mortgage-backed
securities ("RMBS") certificates between 2005 and 2007.
Plaintiff has now brought nine nearly identical actions
against dozens of Defendants, including financial
institutions ("Corporate Defendants") and their current and
former directors and officers ("Individual Defendants"),
seeking to rescind those purchases and/or recover damages.

The complaints allege that Defendants violated sections
410(a) and (b) of the Massachusetts Uniform Securities Act
("MUSA") by misstating or omitting material facts in the
offering documents issued to potential investors.

     Defendants have filed motions to dismiss each
complaint, which Plaintiff opposes.[1]  All of the motions
raise substantially identical issues, including that: (1)
Plaintiff has failed to plead any actionable misstatements
or omissions in the offering documents; (2) the non-
underwriter Defendants are not offerors or sellers under
MUSA section 410(a); (3)  Plaintiff's control person claims
under section 410(b) must be dismissed because Plaintiff has
failed to allege a primary violation under section 410(a)

---

     [1] Defendants filed a joint memorandum in support their
motions to dismiss in the actions numbered 11-30035-MAP
(Dkt. No. 22), 11-30039-MAP (Dkt. No. 17), 11-30044-MAP
(Dkt. No. 17), 11-30047-MAP (Dkt. No. 16), and 11-30048-MAP
(Dkt. No. 23); a substantially identical joint memorandum in
support of their motions to dismiss in the actions numbered
11-30094-MAP (Dkt. No. 24), 11-30126-MAP (Dkt. No. 26), and
11-30127-MAP (Dkt. No. 10); and a separate memorandum, which
to a large extent incorporates the arguments of the joint
memoranda, in the action numbered 11-30141-MAP (Dkt. No.
11).  Each group of Defendants has also filed a supplemental
memorandum addressing facts and arguments particular to its
case.  Plaintiff's oppositions to the motions to dismiss are
also largely identical.

or, in the alternative, has failed to allege the exercise of
control over a primary violator; (4) certain of Plaintiff's
claims are barred by the statute of limitations; and (5) the
court lacks personal jurisdiction over the Individual
Defendants who do not reside in Massachusetts.  The court
will first discuss the global issues that pertain to all
Defendants.  The court will then examine each individual
complaint, applying its findings on the global issues and
considering any issues that are particular to that
complaint.

     For the reasons stated below, the court will allow
Defendants' motions to dismiss to a modest degree.  More
specifically, the court will dismiss Plaintiff's claims of
misstatements or omissions regarding owner-occupancy rates
in all of the complaints, except the complaint against HSBC
Bank USA, National Association, et al. (11-30141-MAP).  The
court will also dismiss Plaintiff's section 410(a) claims
against the non-underwriter Defendants and section 410(b)
claims against Defendants whose control person liability
stems from primary violations by the non-underwriter
Defendants.  The court will deny Defendants' motions in all

other respects.

## II. <u>BACKGROUND</u>

These actions arise out of the sale of RMBS certificates to Plaintiff between 2005 and 2007. All of the certificates at issue were created in a largely identical multi-step securitization process. Loan originators originated mortgage loans to borrowers who were buying or refinancing homes. A sponsor bought loans from the originators and aggregated them into a loan pool, which usually contained thousands of loans. The sponsor then sold the pool to a depositor, who transferred the loans to a trust. The trust issued certificates to the depositor, who sold the certificates to underwriting financial institutions for resale to investors, such as Plaintiff. Defendants in these actions include institutions that served as sponsors, depositors, and underwriters of the loans.

When sold, certificates were accompanied by offering documents that included a prospectus and prospectus supplement. The offering documents provided descriptions of the certificates, summary loan information on the underlying loans, and summary descriptions of the third-party

originators' loan underwriting guidelines.  Plaintiff alleges that the offering documents at issue in these cases misstated or omitted certain material facts, specifically:

(1) Defendants represented that the loans were underwritten using prudent underwriting standards, but, in fact, loan originators systematically disregarded their stated loan underwriting guidelines;

(2) Defendants represented that the valuations of the underlying properties were conducted in accordance with well-established appraisal procedure guidelines and that the resulting loan-to-value ("LTV") ratios were reliable, but, in fact, appraisers routinely failed to follow these procedures and Defendants knowingly reported false appraisals and LTV ratios; and

(3) Defendants represented specific owner-occupancy rates for the underlying properties that turned out to be inaccurate.

Plaintiff further alleges that the misrepresentations materially affected the risk profile of the certificates and caused Plaintiff to purchase securities that were far riskier than disclosed.  The certificates that Plaintiff

7

purchased now qualify as "junk."

Based on the alleged misrepresentations, Plaintiff filed these nine actions against Defendants between February and May 2011.  As noted, Defendants have filed motions to dismiss each complaint.  Because of the significant similarities in the offering documents at issue and the complaints, the court will first consider global issues raised by all of the motions to dismiss as they pertain to all of the complaints.  The court will then discuss any remaining issues that are particular to individual complaints.

### III. <u>DISCUSSION</u>

All of Plaintiff's claims in the complaints arise under MUSA, which imposes civil liability on any person who

> offers or sells a security by means of any untrue
> statement of a material fact or any omission to
> state a material fact necessary in order to make
> the statements made, in the light of the
> circumstances under which they are made, not
> misleading.

Mass. Gen. Laws ch. 110A, § 410(a)(2).  MUSA also imposes joint and several liability on any person who

> directly or indirectly controls a seller liable
> under subsection (a), every partner, officer, or
> director of such a seller, [and] every person

8

        occupying a similar status or performing similar
        functions.

Mass. Gen. Laws ch. 110A, § 410(b).  Plaintiff argues that

all Defendants are liable either under section 410(a) or as

control persons under section 410(b).

     The Massachusetts Legislature has directed courts to

interpret MUSA in coordination with the federal Securities

Act of 1933.  See Marram v. Kobrick Offshore Fund, Ltd., 442

Mass. 43, 50-51, 809 N.E.2d 1017, 1025 (2004).

Consequently, Massachusetts courts -- and federal courts

sitting in diversity jurisdiction -- must look both to

Massachusetts state precedent and to federal precedent under

section 12(2) of the federal Securities Act of 1933 when

interpreting section 410(a) of MUSA.  Id. (noting that MUSA

section 410(a) is "almost identical" to section 12(2) of the

Securities Act and that this similarity "make[s] for an

interchangeability of federal and state judicial precedence

in this very important area" (internal citation omitted)).

     With that background in mind, the court will now turn

to the global issues that pertain to all nine complaints.

A. Global Issues.

     Defendants raise several common issues in their motions

to dismiss, arguing that: (1) Plaintiff has failed to plead any actionable misstatements or omissions in the offering documents, including with regard to the underwriting guidelines, appraisals and LTV ratios, and owner-occupancy rates; (2) the non-underwriter Defendants are not offerors or sellers under MUSA section 410(a); (3) Plaintiff's control person claims under section 410(b) must be dismissed; (4) some of Plaintiff's claims are barred by the statute of limitations; and (5) the court lacks personal jurisdiction over the Individual Defendants.

    1. <u>Pleading Standard</u>.

    Before analyzing the global grounds for dismissal, the court must determine what pleading standard to apply to this case.  It is undisputed that MUSA does not require a plaintiff to plead that a defendant acted with scienter. <u>Marram</u>, 809 N.E.2d at 1026.  Consequently, Plaintiff argues, the heightened pleading requirements of Fed. R. Civ. P. 9(b) do not apply.  See <u>Pearce v. Duchesneau Group, Inc.</u>, 392 F. Supp. 2d 63, 74 n.7 (D. Mass. 2005) (noting that the heightened pleading standard for fraud cases is inapplicable where "scienter, or intent to deceive, are not elements of

[the claim]").

Defendants contend, however, that to the extent
Plaintiff alleges that Defendants knew that the appraisals
of the underlying properties were not reasonably supported
by the actual data, Plaintiff is in essence alleging fraud,
and the heightened pleading standard of Rule 9(b) applies at
least to those claims.  See Shaw v. Digital Equip. Corp., 82
F.3d 1194, 1223 (1st Cir. 1996) (noting that Rule 9(b)
applies to section 12(2) claims where those claims "sound[]
in fraud" because "[i]t is the allegation of fraud, not the
'title' of the claim that brings the policy concerns
[underlying Rule 9(b)] . . . to the forefront"), abrogated
in part on other grounds as recognized in Greebel v. FTP
Software, Inc., 194 F.3d 185 (1st Cir. 1999).

The mere allegation that Defendants knew of the
appraisals' inaccuracy, however, is not enough to constitute
an allegation of fraud.  As the First Circuit in Shaw noted
under similar circumstances,

> Although the complaint does assert that defendants
> actually possessed the information that they
> failed to disclose, those allegations cannot be
> thought to constitute 'averments of fraud,' absent
> any claim of scienter and reliance.  Otherwise,
> any allegation of nondisclosure of material

11

information would be transformed into a claim of
fraud for purposes of Rule 9(b).

Id.

Plaintiff also argues that the liberal notice pleading
standard under Rule 8(a) must be further relaxed because
most of the evidence in this case is in Defendants'
possession.  However, the cases Plaintiff cites in support
of this proposition are all in the context of a heightened
Rule 9(a) pleading standard and do not support a relaxed
pleading standard for pre-discovery motions under Rule 8(a).
See, e.g., In re Cabletron Systems, Inc., 311 F.3d 11, 33
(1st Cir. 2002); Maldonado v. Dominguez, 137 F.3d 1, 9 (1st
Cir. 1998) ("While Fed. R. Civ. P. 9(b) proscribes the
pleading of 'fraud by hindsight,' we also cannot expect
plaintiffs to plead 'fraud with complete insight' before
discovery is complete.").  Thus, the court will decline to
adopt either side's proposed pleading standard and examine
Plaintiff's complaints under the usual Rule 8(a) rubric.

   2. Failure to Plead Misstatements or Omissions.

To state a claim under MUSA section 410(a), Plaintiff
must show that (1) Defendants offered or sold securities in
Massachusetts; (2) by making an untrue statement of, or

12

omitting, any material fact; (3) Plaintiff did not know of
the untruth or omission; and (4) Defendants knew or should
have known of the untruth or omission.  <u>Marram</u>, 809 N.E.2d
at 1026.  Plaintiff does not need to prove negligence,
scienter, reliance, or loss causation.  <u>Id.</u> at 1026-27.
Furthermore, the buyer's sophistication is irrelevant to a
MUSA claim, and the buyer has no duty to investigate or
verify a statement's accuracy.  <u>Id.</u> at 1027.

Defendants argue that Plaintiff has failed to plead any
untrue statement or omission of material fact and, thus, has
failed to state a claim under section 410(a).

a. <u>Underwriting Guidelines</u>.

The first group of misstatements or omissions alleged
by Plaintiff concerns statements regarding the underwriting
guidelines used to generate loans.  Plaintiff alleges that
all of the Defendants made certain representations about the
underwriting process, including that loan originators
collected financial information from borrowers to ensure
that loans could be repaid, that originators consistently
applied underwriting standards to confirm borrowers' ability
to repay, and that any deviations from the standards were

13

justified by sufficient compensating factors.  Plaintiff
further alleges that these representations were false
because the originators systematically violated the
underwriting standards by, for example, issuing loans on the
basis of overstated incomes, inflated appraisals, and
unjustified exceptions to the standards.

Plaintiff provides varying degrees of support for these
allegations in the different complaints.  All of the
complaints allege (1) that there was a general incentive in
the industry to abandon underwriting guidelines, (2) that
the underlying loans have experienced high percentages of
defaults, delinquencies, and foreclosures that, according to
Plaintiff, can only be explained by a widespread abandonment
of underwriting standards, and (3) that a subsequent
forensic analysis of the loan data confirms that Defendants
abandoned their disclosed underwriting standards.  Some of
the complaints provide further factual support.  In the
complaints against the RFC Defendants[2] (11-30035-MAP) and

---

[2] These Defendants are: Residential Funding Company,
LLC; Residential Accredit Loans, Inc.; Residential Asset
Mortgage Products, Inc.; Residential Asset Securities
Corporation; and Residential Funding Securities, LLC.

14

the DB Defendants[3] (11-30039-MAP), Plaintiff alleges that a company insuring the securitizations found that over eighty percent of the loans were originated in violation of the represented standards.  In the complaint against the JP Morgan Defendants, the Bear Stearns Defendants, and the WaMu Defendants[4] (11-30094-MAP), and the complaint against the American Home Defendants[5] (11-30126-MAP), Plaintiff cites statements from employees of Defendants and relevant third

---

[3] These Defendants are: DB Structured Products, Inc.; Deutsche Alt-A Securities, Inc.; ACE Securities Corp.; and Deutsche Bank Securities, Inc.

[4] The JP Morgan Defendants are: JP Morgan Chase Bank, N.A.; J.P. Morgan Mortgage Acquisition Corporation; J.P. Morgan Securities LLC; and J.P. Morgan Acceptance Corporation I.

The Bear Stearns Defendants are: EMC Mortgage Corporation, Structured Asset Mortgage Investments II Inc.; Bear Stearns Asset Backed Securities I LLC; and Cohen Legacy, LLC.

The WaMu Defendants are: WaMu Asset Acceptance Corporation; WaMu Capital Corporation, and Washington Mutual Mortgage Securities Corporation.

[5] These Defendants are: Goldman Sachs Mortgage Company; Bear Stearns Asset Backed Securities I LLC; American Home Mortgage Securities LLC; American Home Mortgage Assets LLC; Goldman Sachs & Co., Inc.; J.P. Morgan Securities LLC; Barclays Capital Inc.; and UBS Securities LLC.

parties, confidential witnesses, and internal documents[6]
that the loans were not originated using the represented
underwriting standards.

Defendants make a two-fold argument for why these
allegations are insufficient to state a claim.  First,
Defendants argue that the offering documents accurately
disclosed all of the information Plaintiff claims was
misstated or omitted.[7]  According to Defendants, the

_____

[6] In the complaint against the American Home
Defendants, Plaintiff alleges that the mortgage loans
underlying the certificates at issue were originated by non-
party American Home Mortgage Investment Corp. ("AHM").
Plaintiff cites to statements by AHM employees, other
witnesses, and internal documents to show that AHM imposed
pressure on its underwriters to approve mortgage loans and
routinely abandoned its underwriting guidelines.

In the complaint against the JP Morgan Defendants,
Plaintiff cites statements by Defendants' own employees and
internal documents to show abandonment of underwriting
guidelines.

[7] In addition to pointing to specific disclosures
concerning the underwriting guidelines, appraisals, and
owner-occupancy rates, Defendants also argue that the
offering documents all contained "cure, repurchase or
substitute" provisions disclosing that some of the mortgage
loans might not conform to the representations of the
mortgage sellers.  The provisions obligated sellers of such
loans to cure, repurchase, or substitute the non-conforming
loans upon request.  According to Defendants, Defendants
made no actionable misrepresentations in light of these
provisions.  See Lone Star Fund V (U.S.), L.P. v. Barclays

16

offering documents stated that originators could and would

make exceptions to their underwriting guidelines.  The

documents also disclosed that originators used no-

documentation programs that required little or no

documentary verification from borrowers and that, as a

result, the loans might experience higher rates of

---

Bank PLC ("Lone Star"), 596 F.3d 383, 389 (5th Cir. 2010)
(holding that, in light of a similar repurchase or
substitute clause, defendant did not represent that the
mortgage pools "were absolutely free from delinquent loans"
and, because plaintiff did not allege that defendant failed
to repurchase or substitute, defendant made no actionable
misrepresentations even though the mortgage pools contained
delinquent loans).

    However, the holding in Lone Star, on which Defendants
exclusively rely, is limited to cases involving a small
number of correctable mistakes, and courts have refused to
allow such clauses to defeat claims of the type of
widespread misrepresentation alleged here.  See, e.g.,
Emps.' Ret. Sys. of the Gov't of the V.I. v. J.P. Morgan
Chase & Co., No. 09 Civ. 3701 (JGK), 2011 WL 1796426, at *11
(S.D.N.Y. May 10, 2011) (noting that Lone Star is
distinguishable from cases in which plaintiffs claim
"widespread misrepresentations regarding the nature of the
underwriting [and appraisal] practices described in the
offering documents" (internal citation omitted)); see also
P.L.I. Sec. Litig. § 18:4.4, 18-65 to 18-66 (2011) (noting
the various ways in which other jurisdictions have
distinguished Lone Star, including by limiting it to
representations about the absence of delinquent loans and by
finding that contractual obligations cannot deprive
investors of their rights under the Securities Act).

delinquencies and foreclosures.

The disclosures noted by Defendants, however, are not enough to vitiate Plaintiff's section 410(a) claim.  The First Circuit considered similar disclosures in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp. ("Nomura") and held that these types of warnings and disclosures cannot defeat a claim that, like the claims here, is based on "wholesale abandonment of underwriting standards."  632 F.3d 762, 773 (1st Cir. 2011).

Second, Defendants contend that the complaints have failed to plead a "wholesale abandonment of underwriting standards."  This argument is also unpersuasive.  In light of the standard set forth in Nomura, Plaintiff has satisfied the pleading requirements for a motion to dismiss in all cases.  In Nomura, the First Circuit held that to state a claim upon which relief can be granted, the complaint must allege specific practices of abandoning guidelines and must "link such practices with specific lending banks that supplied the mortgages that underpinned the trusts."  Id. at 773-74.  The court noted that, while most complaints cite to more substantial sources such as statements from

18

confidential witnesses, former employees, and internal e-mails, the allegations in <u>Nomura</u> of a "sharp drop in the credit ratings" along with allegations regarding the specific defendants were sufficient to warrant some initial discovery, even without those more substantial sources.  <u>Id.</u>

Among the cases now before this court, the two complaints that do cite to internal documents and witness testimony easily pass the pleading hurdle set forth in <u>Nomura</u>.  The allegations set forth in the remaining complaints, while they present a closer call, are also sufficient to survive a motion to dismiss.  As in <u>Nomura</u>, Plaintiff has alleged in each of the complaints a widespread abandonment of underwriting guidelines by these specific Defendants and poor performance of the loans.  Defendants' contend that the poor performance of the loans is due solely to the economic downturn, but this is a question of fact that cannot be resolved on a motion to dismiss.  Under the applicable Rule 8(a) pleading standard, the allegations in all of the complaints are sufficient at this stage of the proceedings.

      b. <u>Appraisals and LTV Ratios</u>.

Plaintiff also alleges misstatements and omissions of material fact regarding the standards used for appraisals of the mortgaged properties and the resulting LTV ratios for the loans.  Plaintiff alleges that the appraisals were routinely conducted in violation of the disclosed standards and, as a result, Defendants inflated appraisals and understated LTV ratios.  Plaintiff further alleges that, based on Defendants' involvement in the securitization process and their duty to conduct due diligence, Defendants knew the LTV ratios and appraisals were false.  In support of its allegations, Plaintiff has alleged the "true" LTV ratios at the time of the securitizations as calculated by an automated valuation model ("AVM").  The AVM, according to Plaintiff, was based on similar data as in-person appraisals, including county assessor records, tax rolls, and data on comparable properties.

Defendants raise several arguments against these allegations.  First, Defendants argue that all of the offering documents actually disclosed the information Plaintiff now claims was misstated.  The documents warned investors that no assurance could be given that the value of

20

any mortgaged property would remain at its current appraised value and that the LTV ratios might not provide an accurate measure of the risk of loss because property values could fluctuate.  For example, some of the documents warned that appraisers might be staff appraisers employed by the originator, that appraisers might feel pressure from loan originators to overstate the appraised value of property, and that appraisal values might not equal the actual values of the properties.

The reasoning of <u>Nomura</u> concerning disclosures of underwriting guidelines again applies here.  As with the warnings regarding underwriting standards, warnings to the effect that some of the appraisals might be overstated or that property values might fluctuate are insufficient to defeat Plaintiff's claims, because these disclosures did not put Plaintiff on notice that the appraisers were <u>systematically</u> abandoning the represented appraisal procedures and understating LTV ratios.  Furthermore, any warning that the property values might fluctuate did not warn Plaintiff that Defendants <u>knew</u> the existing appraisal values were inaccurate at the time of representation, as

Plaintiff alleges.

Defendants next argue that, even if the disclosures were insufficient to defeat Plaintiff's claims, Plaintiff's allegations regarding appraisals and LTV ratios are based on non-actionable opinions of third parties.  According to Defendants, appraisals are not statements of fact, but opinions.  Cf. Nomura, 632 F.3d at 774-75 (holding that investment ratings were opinions about the value and prospects of certificates, not statements of fact).  An opinion can only be an actionable misstatement if "it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement."  Id. at 775.  If the opinion falls into one of these categories, liability will also extend to someone who accurately described the opinion.  Id.  If, on the other hand, an opinion was "honestly held when formed but simply turn[ed] out later to be inaccurate" or even if the appraisers could have formed "better" opinions, Defendants are not liable for any misstatement or omission.  Id.

In this case, while the appraisals and LTV ratios

22

themselves may have been opinions, Defendants ignore
Plaintiff's allegation that the appraisals were conducted in
violation of disclosed appraisal standards.  A
representation that certain specific standards will be used
to generate appraisals is itself an actionable statement of
fact.

Furthermore, Plaintiff has also made sufficient
allegations to plead an actionable opinion.  While
Defendants accurately note that Plaintiff has not pled that
the appraisers did not believe their appraisals at the time
they were given, such an allegation is not necessary to
state a claim under section 410(a).  An opinion is also
actionable if it has no basis in fact.  Id.  Consequently,
Plaintiff's allegations that Defendants knew that the
appraisals and LTV ratios "bore no relationship to the
actual data and characteristics of the properties" and knew
that they were "not justified, unreasonable and inaccurate"
are sufficient to make the statements of opinion actionable.
Indeed, in finding that the allegations in Nomura concerned
non-actionable opinions, the First Circuit specifically
noted that the complaint in that case -- unlike the

complaint in this case --

> stop[ped] short of alleging expressly that the
> leadership of [defendant] believed that their
> companies' ratings were false or were unsupported
> by models that generally captured the quality of
> the securities being rated.

Id.

Finally, Defendants argue that the complaints lack any
factual matter to support allegations of knowledge on
Defendants' part.  This argument is also unpersuasive.
Knowledge may be inferred from surrounding circumstances and
Defendants' alleged access to the underlying appraisal data
as well as their duty to conduct due diligence creates a
reasonable inference of knowledge.  Furthermore, Plaintiff's
allegations regarding its AVM model provide further support
that the appraisals had no basis in fact.  Plaintiff alleges
that the AVM appraisals are based on similar data as in-
person appraisals and that they are widely accepted and
produce accurate estimates.  According to Plaintiff, the
results of the AVM, which diverge greatly from the
appraisals Defendants supplied, create a reasonable
inference that the LTV ratios were knowingly understated and
the appraisals knowingly inflated.

24

Defendants take issue with Plaintiff's reliance on the AVM, arguing that Plaintiff has not fully revealed the assumptions and inputs that generated its AVM, that the AVM is fundamentally flawed because it relies on subsequent sale prices of the properties, and that the results of the AVM are irrelevant because, per the decision in Nomura, Defendants cannot be held liable on the grounds that they could have formed a "better" opinion.  These arguments regarding the methodological flaws of the AVM, however, are premature at the motion to dismiss stage, especially considering the significant allegations Plaintiff has made concerning the methodology of the AVM model.  Furthermore, while the results of the AVM do not conclusively show that Defendants knew the LTV ratios had no basis in fact, these results combined with Plaintiff's allegation of Defendants' access to the underlying appraisal data and their duty to conduct due diligence are more than sufficient at this stage of the litigation.

In sum, Plaintiff has alleged actionable misrepresentations of fact by alleging that Defendants misrepresented the standard used to generate appraisals.

Plaintiff has also alleged actionable misrepresentations of
opinion by pleading that the appraisals and LTV ratios had
no basis in fact, thus subjecting Defendants to liability
for third party opinions.

      c. <u>Owner-Occupancy Rates</u>.

    The third and final category of misrepresentations that
Plaintiff alleges concern owner-occupancy rates.  Plaintiff
alleges that Defendants represented certain owner-occupancy
rates for the properties underlying the securitizations.
Plaintiff further alleges that a forensic analysis it
conducted of tax records, borrower credit records, and
property records found owner-occupancy rates to be
substantially lower than Defendants represented.

    These allegations fail to state an actionable claim
against most of the Defendants.  The majority of the
offering documents made clear that the stated occupancy
status referred to the <u>borrowers</u>' representations of their
intended use of the mortgaged property at the time that the
loan was originated, and many of the documents explicitly
disclosed the possibility of borrower misrepresentations or

fraud.[8]  See <u>Footbridge Ltd. v.Countrywide Home Loans, Inc.</u>,
No. 09 Civ. 4050(PKC), 2010 WL 3790810, at *9 (S.D.N.Y.
Sept. 28, 2010) (dismissing fraud claims based on
misrepresentations of borrower occupancy rates because
"[t]he statements in the Detailed Reports include additional
limiting language that explains that the percentages
reported are '[b]ased upon representations of the related
borrowers at the time of origination'").

These disclosures made by Defendants in the cases now
before this court were fundamentally different from those
the First Circuit found insufficient to shield the
defendants from liability in <u>Nomura</u>.  Unlike the disclosures
in <u>Nomura</u>, the disclosures regarding owner-occupancy rates
in these cases did more than simply warn investors that
guidelines might not always be followed or that some of the
rates might fluctuate.  The disclosures specifically stated
that <u>all</u> owner-occupancy rates were based <u>only</u> on borrowers'

---

[8] It appears that the offering documents at issue in the
complaint against HSBC Bank USA, National Association, et
al. (11-30141-MAP) did not contain such disclosures.  The
court will discuss this issue in more detail after it
finishes its discussion of the global issues and moves to a
specific assessment of each complaint.

representations.  The disclosures thus put investors on notice that none of the owner-occupancy information had been verified by Defendants and that the rates represented only the self-reported data provided by borrowers, which might be inaccurate.

Because the offering documents explicitly stated that all occupancy rates were based only on borrowers' representations and because Plaintiff does not allege that Defendants falsely reported the borrowers' representations, the documents relied on by Plaintiff contained no misstatements or omissions concerning owner-occupancy rates as a matter of law.  For this reason, Defendants' motions will be allowed as to Plaintiff's claims of misstatements or omissions regarding owner-occupancy rates.

3. Non-Underwriter Defendants.

To be liable under section 410(a) of MUSA, Defendants must have offered or sold securities.  Mass. Gen. Laws ch. 110A, § 410(a).  Defendants argue that the non-underwriter Defendants -- those Defendants who did not directly sell certificates to investors -- are not offerors or sellers of securities, as defined by MUSA, and thus Plaintiff's claims

28

against these Defendants must be dismissed.

An offeror or seller for purposes of MUSA is someone who "successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Pinter v. Dahl, 486 U.S. 622, 647, 108 S.Ct. 2063, 2078, 100 L.Ed.2d 658 (1988) (interpreting section 12(a)(2) of the Securities Act of 1933); see also Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 686 (D. Mass. 1993) (finding that MUSA's definition of "seller" is identical to the definition under the federal Securities Act).  This definition includes those who actually transfer title of the securities as well as brokers and other agents of the direct seller.  Pinter, 486 U.S. at 646-47, 108 S.Ct. 2063.

It is undisputed that the non-underwriter Defendants did not directly transfer title of the securities to Plaintiff.  It is true that the complaints offer allegations that the non-underwriter Defendants "successfully solicited" Plaintiff's purchase of securities to further their own financial motives, as required for MUSA liability.  The First Circuit has recognized, however, that this type of

unsupported conclusory allegation is insufficient by itself
to survive a motion to dismiss.  See Shaw, 82 F.3d at 1216
("Here it is undisputed that the public offering was
conducted pursuant to a firm commitment underwriting, and
plaintiff's bald and factually unsupported allegation that
the issuer and individual officers of the issuer 'solicited'
the plaintiffs' securities purchases is not, standing alone,
sufficient.").

The more specific allegations of the non-underwriter
Defendants' conduct contained in the complaints are that
Defendants acquired the mortgage loans, conveyed or sold
them to the offering trusts, were responsible for
registering the securities with the Securities and Exchange
Commission ("SEC"), helped prepare the offering materials,
and profited from the sale of the certificates.  Again,
these allegations do not suffice.  The relevant inquiry for
seller liability is the "defendant's relationship with the
plaintiff-purchaser," not "the defendant's degree of
involvement in the securities transaction and its
surrounding circumstances."  Pinter v. Dahl, 486 U.S. at
651, 108 S.Ct. 2063.  Following Pinter, the First Circuit

and several courts in the District of Massachusetts have
held that actions substantially similar to those alleged
here, including aiding in the general sale of securities and
preparing offering documents, do not amount to soliciting
securities.[9] <u>Shaw</u>, 82 F.3d at 1216 ("Under <u>Pinter</u> . . .
neither involvement in preparation of a registration
statement or prospectus nor participation in 'activities'
relating to the sale of securities, standing alone,
demonstrates the kind of <u>relationship between defendant and
plaintiff</u> that could establish statutory seller status."
(emphasis in original)); <u>In re Evergreen Ultra Short</u>

---

[9] Plaintiff argues that the First Circuit in <u>Nomura</u>
held that allegations that "defendants promoted and sold
[c]ertificates to [the p]laintiffs" were sufficient to state
a claim against a depositor and two trusts that issued
mortgage-backed securities, but did not directly transfer
title to plaintiffs.  632 F.3d at 776.  However, neither the
district court nor the First Circuit in <u>Nomura</u> considered
the question of what constitutes "solicitation" of
securities purchases.  Instead, the courts addressed whether
plaintiffs sufficiently alleged that "the purchases were
made directly in a public offering, rather than in the
aftermarket."  <u>Plumbers' Union Local No. 12 Pension Fund v.
Nomura Asset Acceptance Corp.</u>, 658 F. Supp. 2d 299, 304-05
(D. Mass. 2009) (holding that plaintiffs failed to plead
that the securities at issue were purchased directly from
any defendant in a public offering and, thus, their claims
against all defendants -- both underwriters and non-
underwriters -- had to be dismissed), <u>rev'd by</u> 632 F.3d 762,
776 (1st Cir. 2011).

Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86, 95-96
(D. Mass. 2010) (applying Pinter and Shaw to find that
signing registration statements and participating in the
drafting of offering materials was insufficient for
statutory seller liability); In re Sonus Networks, Inc. Sec.
Litig., No. 04-cv-10294, 2006 WL 1308165, at *10 (D. Mass.
May 10, 2006) (same).  Accord Lone Star Ladies Inv. Club v.
Schlotzsky's Inc., 238 F.3d 363 (5th Cir. 2001) ("[I]n a
firm commitment underwriting . . . the public cannot
ordinarily hold the issuers liable under section 12, because
the public does not purchase from the issuers. . . .
Virtually all issuers routinely promote a new issue, if only
in the form of preparing a prospectus and conducting a road
show.").

     As in those cases, Plaintiff's allegations here -- all
of which deal primarily with Defendants' involvement in the
securities transactions -- are insufficient to allege the
type of relationship between Defendants and Plaintiff that
is necessary to survive a motion to dismiss.[10]

──────────────────

     [10] The cases Plaintiff relies on to establish seller
liability are all not binding on this court and, more
importantly, factually distinguishable from these cases.

Plaintiff relies on SEC Rule 159A, which provides that an issuer is a seller of securities for purposes of section 12(a)(2) of the Securities Act of 1933.  17 C.F.R. § 230.159A.  While this Rule would seem to bear directly on the issue, only two courts have applied the Rule since it became effective on December 1, 2005.  See In re Oppenheimer Rochester Funds Group Sec. Litig., No. 09-MD-02063-JKL-KMT, 2012 WL 171035, at *28 (D. Colo. Jan. 20, 2012); Citiline Holdings, Inc. v. iStar Financial Inc., 701 F. Supp. 2d 506, 507 (S.D.N.Y. 2010).  Numerous other courts that have considered this question -- including courts in this circuit

---

See, e.g., Capri v. Murphy, 856 F.2d 473 (2d Cir. 1988) (finding seller liability because, although someone other than defendants was in direct communication with plaintiffs, that individual's "promotional efforts were done 'at the behest of [defendants]'"; he "'provided no information to the investors other than what was supplied by defendants'"; and he "'took no action in relation to the investors other than that which was contemplated and authorized by defendants'"); Stephenson v. Deutsche Bank AG, 282 F. Supp. 2d 1032, 1063-63 (D. Minn. 2003) (alleging facts to show that defendant "exert[ed] such control over another's solicitation that those efforts [were] 'directly attributable' to the defendant"); In re U.S.A. Classic Sec. Litig., Civ. A. No. 93-6667, 1995 WL 363841, at *4 (S.D.N.Y. June 19, 1995) (holding that defendant was a "seller" because, even though it did not directly transfer the stock, it was the sole shareholder of the company that was the direct seller and the proceeds of the sale were used to repay indebtedness owed to defendant).

-- have applied the Supreme Court's decision in <u>Pinter</u> to find that an issuer is not a statutory seller, without even mentioning Rule 159A.

Under <u>Pinter</u>, it is not enough that a defendant "participate[d] in soliciting the purchase" of securities or was a "'substantial factor' in causing the sale of [] securities" to hold the defendant liable as a seller. 486 U.S. at 651 n.27, 654, 108 S.Ct. 2063. The defendant must be "directly involved in the actual solicitation of a securities purchase." <u>Shaw</u>, 82 F.3d at 1215. While an SEC regulation is, of course, entitled to consideration, it cannot countermand a contrary Supreme Court holding. Consequently, the court finds that, in accordance with <u>Pinter</u> and First Circuit precedent and despite SEC Rule 159A, the non-underwriter Defendants are not liable as sellers under MUSA section 410(a). <u>See</u> <u>Me. State Ret. Sys.</u> <u>v. Countrywide Fin. Corp.</u>, No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011) (holding that issuers are not statutory sellers under Section 12(a)(2) because, "regardless of what the SEC's position may be, Plaintiffs must allege direct solicitation"). Plaintiff's

section 410(a) claims against the non-underwriter Defendants will be dismissed.

    4. <u>Control Person Claims</u>.

    To state a control person claim under section 410(b), Plaintiff must first plead a primary violation under section 410(a).  For the reasons discussed earlier, Plaintiff has adequately pled primary violations by the underwriter Defendants, but not by the non-underwriter Defendants. Consequently, the section 410(b) claims against those Defendants who are alleged to be control persons of only non-underwriter Defendants will be dismissed.  For all other Defendants, Plaintiff has alleged that they controlled primary violators, and the allegations of control are sufficient to survive a motion to dismiss.

    5. <u>Statute of Limitations</u>.

    Claims under MUSA section 410(a) are subject to a four-year statute of limitations that runs from the date the plaintiff is put on inquiry notice of its claims.  <u>Marram</u>, 809 N.E.2d at 1028 n.20.  Plaintiff is on inquiry notice from the time "a reasonable investor would have noticed something was 'amiss.'"  <u>Id.</u> (internal citation omitted).

Defendants argue that Plaintiff knew or should have known
the facts it alleges in its complaints by early 2007 -- four
years before it filed the first of these actions[11] -- and,
thus, any claims based on securities it bought before that
date are time-barred.

In support of this argument, Defendants point to
newspaper articles, industry publications, and government
reports that were publicly available before early 2007.
Defendants claim these documents put Plaintiff on notice of
the mortgage loan origination problems alleged in the
complaints, including the failure of originators to verify
borrower information, inflated appraisals and understated
LTV ratios, and occupancy fraud.

This information, however, was insufficient to
establish inquiry notice because it did not directly relate
to the misrepresentations and omissions alleged in the
complaints.  The articles and other publications provided
only generalized reports on the industry, did not discuss
Defendants' practices specifically, and did not alert

---

[11] The first action, 11-30035-MAP, was filed on February
9, 2011.  The last action, 11-30141-MAP, was filed on May
20, 2011.

Plaintiff to potential fraud in any specific securitization
it had purchased.

Defendants also argue that, when Plaintiff began buying
the certificates in 2005, it had access to monthly loan data
reports that were publicly available through the trust
administrators.  These reports disclosed the percentage of
loans in delinquency or default for each loan pool
underlying the certificates at issue.  According to
Defendants, the reports showed an increase in the number of
loans going into default as the market worsened in 2006 and
2007, putting Plaintiff on inquiry notice.  Additionally,
according to Defendants, the offering documents for the 2007
certificates included additional warnings of increasing loan
defaults, depreciation of appraisal values, and problems
with loan originators.

While these reports and warnings may have indicated
that the loans were performing poorly, they did not put
Plaintiff on notice that the specific underwriting and
appraisal practices represented in the offering materials
were false.  According to Plaintiff, the loan reports and
additional warnings related only to a small subset of the

securitizations, and could not alert Plaintiff to a wholesale abandonment of guidelines for each of the securitizations alleged in the complaints.  Plaintiff further disputes Defendants' characterization of the reports, arguing that these few loan reports did not reflect extraordinarily high rates of default and delinquencies.

At this point in the litigation, Defendants have not met the relatively high burden to demonstrate that Plaintiff was on inquiry notice in 2007.  Cf. Warren Freedenfeld Assocs., Inc. v. McTigue, 531 F.3d 38, 46 (1st Cir. 2008) ("Where, as here, dismissal is premised on the running of a statute of limitations, we will affirm only if the facts . . . 'leave no doubt that an asserted claim is time-barred.'" (internal citation omitted)).  Indeed, courts have been reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice of similar claims as late as mid-2008, let alone as early as 2007.  See, e.g., In re IndyMac Mortgage-Backed Sec. Litig., 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010) (no inquiry notice as of May 2008); Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc., No. 09 CV 1110(HB), 2011 WL 135821, at *8-9 (S.D.N.Y. Jan. 12,

2011) (no inquiry notice as of February 2008).  The court

finds that the facts as alleged in the complaints do not

warrant dismissal of Plaintiff's claims as time-barred.[12]

    6. <u>Personal Jurisdiction</u>.

    The last global issue in these cases is personal

jurisdiction.  Defendants argue that the court lacks

personal jurisdiction over the non-resident Individual

Defendants.  To establish personal jurisdiction, Plaintiff

must make a <u>prima facie</u> showing of facts necessary to

---

    [12] Defendants also argue that, in light of information
available in the public domain as well as the various
disclosures and warnings included in the offering documents,
Plaintiff has failed to plead how the allegedly misstated or
omitted information was material.  Materiality is an element
of a claim under section 410(a).  <u>See</u> <u>Marram</u>, 809 N.E.2d at
1030 (noting that information is material if there is a
"substantial likelihood" that a "reasonable investor" would
have viewed the information as "having significantly altered
the 'total mix' of information made available" (internal
citation omitted)).

    Although the issue of materiality can be determined as
a matter of law on a motion to dismiss under some
circumstances, <u>see, e.g.</u>, <u>Glassman v. Comptervision Corp.</u>,
90 F.3d 617, 631-33 & n.22 (1st Cir. 1996), the alleged
misrepresentations in this case are not "so obviously
unimportant to an investor that reasonable minds cannot
differ on the question of materiality."  <u>Marram</u>, 809 N.E.2d
at 1030.  Thus, it would be inappropriate "to rule that the
allegations are inactionable as a matter of law" in these
cases.  <u>Id.</u>

satisfy the requirements of a statute that authorizes jurisdiction and of the Due Process Clause.  Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992) (noting that a prima facie showing must be based on "evidence of specific facts set forth in the records").[13]  Massachusetts courts, however, can "sidestep the statutory inquiry and proceed directly to the constitutional analysis because the state's long-arm statute is coextensive with the limits allowed by the Constitution."  Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (internal citation omitted).[14]

_____

[13] Plaintiff argues that a different standard must be used for pre-discovery motions to dismiss.  However, no case from the First Circuit supports this proposition.  On the contrary, the First Circuit in Boit specifically noted that, while other jurisdictions "hold that allegations in a complaint, unsupported by any evidence in the record before the court, are sufficient to make a prima facie showing of personal jurisdiction . . . . [i]t has long been the rule of this circuit . . . that plaintiffs may not rely on unsupported allegations in their pleadings to make a prima facie showing of personal jurisdiction."  967 F.2d at 675; see also Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 23 (1st Cir. 2007) (applying the same prima facie standard as Boit to a pre-discovery jurisdictional challenge).

[14] All parties agree that section 414(h) of MUSA may also supply the statutory authorization necessary for personal jurisdiction.  Mass. Gen. Laws ch. 110A, § 414(h) ("When any person, including any nonresident of the commonwealth, engages in conduct prohibited or made

Under the Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant only if that defendant "ha[s] certain minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Phillips v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008) (internal citation omitted).  To meet this standard, Plaintiff must establish that (1) the claims arise out of or are related to Defendants' contacts with the forum state; (2) Defendants have purposefully availed themselves of the privileges of conducting activities within the forum state, thus invoking the benefits and protections of that state's laws and making Defendants' presence before the

_____

actionable by this chapter . . . and he has not filed a consent of service of process under subsection (g) and personal jurisdiction over him cannot otherwise be obtained in the commonwealth, that conduct shall be considered equivalent to his appointment of the secretary or his successor in office to be his attorney to receive service of any lawful process in any non-criminal suit, action, or proceeding against him . . . which grows out of that conduct and which is brought under this chapter . . . , with the same force and validity as if served on him personally.").  Defendants argue, however, that the court's exercise of personal jurisdiction over the Individual Defendants in these cases would violate the requirements of the Due Process Clause.  A constitutional defect in the exercise of jurisdiction would obviously trump any statutory provision.

41

state's courts foreseeable; and (3) exercise of jurisdiction is reasonable.  Id.

To satisfy the first component of the due process analysis -- relatedness -- a plaintiff must show that "the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts."  Id. (internal citation omitted).  In other words, the defendant's in-state contacts must be an important or material element of proof in the case.  Id.

In these cases, the relatedness component has been met. Plaintiff alleges that the Individual Defendants engaged in activities in Massachusetts, such as directing the Corporate Defendants to sell securities in Massachusetts, including to Plaintiff, and signing registration statements for those securitizations.  Those registration statements contained the allegedly false statements on which Plaintiff now directly bases its claims.

The second component -- purposeful availment -- presents a more difficult question.  To show that a defendant purposefully availed himself of "the privilege of conducting activities in the forum state," a plaintiff must

show voluntariness and foreseeability.  Daynard v. Ness,
Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 61
(1st Cir. 2002) (internal citation omitted).  Voluntary
contacts cannot be "based on the unilateral actions of
another party."  Adelson v. Hananel, 510 F.3d 43, 50 (1st
Cir. 2007).  Foreseeability is satisfied if the defendant's
contacts were such that he could "reasonably anticipate
being haled into court [in the forum state]."  Id. (internal
citation omitted).

Plaintiff alleges that the Individual Defendants
exercised control over the Corporate Defendants and directed
the Corporate Defendants to sell securities in
Massachusetts.  In this way, according to Plaintiff, the
Individual Defendants purposefully availed themselves of the
privilege of conducting business in Massachusetts.  Apart
from these general allegations of control, the only
allegation of specific conduct by the Individual Defendants
is that they signed registration statements that were filed
with the SEC and pursuant to which securities were sold in
Massachusetts.

Plaintiff argues that these allegations are sufficient

43

for personal jurisdiction and cite decisions by other courts that have exercised personal jurisdiction on the basis of defendants' signing registration statements.  See, e.g., In re LDK Solar Sec. Litig., No. C 07-05182 WHA, 2008 WL 4369987, at *6 (N.D.Cal. Sept. 24, 2008) (exercising personal jurisdiction over individual defendants who signed allegedly false prospectuses and noting that "[c]ourts regularly assert jurisdiction in such circumstances"); In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 352 (D. Md. 2004) ("[C]ourts frequently have asserted personal jurisdiction over individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors."); In re CINAR Copr. Sec. Litig., 186 F. Supp. 2d 279, 305 (E.D.N.Y. 2002) ("[I]t is perfectly reasonable to exercise jurisdiction over [defendant] based solely on her signing the 1999 Registration Statement.").

While these cases offer some support for Plaintiff, their value is limited, because they involve foreign defendants accused of violating the federal securities laws,

44

which provide for nationwide service of process.  The
jurisdictional inquiry in those cases focused on whether the
foreign defendants had sufficient minimum contacts with the
Untied States, not any particular state.  The courts found
that signing registration statements that were filed with
the SEC and distributed to U.S. investors was sufficient to
establish minimum contacts with the United States.  In the
cases before this court, on the other hand, Plaintiff must
establish that Defendants had sufficient minimum contacts
with Massachusetts specifically.  The Individual Defendants
did not sign anything that was filed with any Massachusetts
authority; they only signed documents that were filed with
the SEC and distributed to investors in numerous different
states, including Massachusetts.

     While it may (or may not) be true that merely signing a
SEC registration is insufficient to establish personal
jurisdiction in Massachusetts, Plaintiff's allegations go a
step further.  The complaint asserts that the Individual
Defendants were "control" persons who directed the sale of
securities in Massachusetts.  Allegations of this sort,
which must be accepted as true on a motion to dismiss, are

45

sufficient to make a <u>prima facie</u> showing of purposeful

availment.  <u>Cf.</u> <u>J2 Global Commc'ns, Inc. v. Blue Jay, Inc.</u>,

No. C 08-4254 PJH, 2009 WL 29905, at *5, 9 (N.D. Cal. Jan.

05, 2009) (exercising personal jurisdiction over a defendant

whose only contact with California was in his role as

corporate president, directing agents to send fax

advertisements to a nationwide network of servers, including

in California).

Finally, the third component -- reasonableness -- is

determined by weighing five factors:

> (1) the defendant's burden of appearing; (2) the
> forum state's interest in adjudicating the
> dispute; (3) the plaintiff's interest in obtaining
> convenient and effective relief; (4) the judicial
> system's interest in obtaining the most effective
> resolution of the controversy, and (5) the common
> interests of all sovereigns in promoting
> substantive social policies.

<u>United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant</u>

<u>St. Corp.</u>, 960 F.2d 1080, 1088 (1st Cir. 1992).  If the

first two components of the due process analysis are

satisfied, the defendant has the burden to make "a

compelling case" that exercising jurisdiction would be

unreasonable.  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462,

477, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).

In these cases, Defendants have not met that burden.
Although the Individual Defendants do not reside in
Massachusetts, they have not shown any "special or unusual
burden" they would face in defending against a suit in
Massachusetts.  Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir.
1994) ("[I]nsofar as staging a defense in a foreign
jurisdiction is almost always inconvenient and/or costly, we
think this factor is only meaningful where a party can
demonstrate some kind of special or unusual burden.").
Massachusetts has a strong interest in enforcing its
securities laws and protecting its investors.  Bulldog, 929
N.E.2d at 301 ("Massachusetts has a strong interest in
adjudicating violations of Massachusetts securities law.").
A single suit in Plaintiff's home state provides Plaintiff
with the opportunity for convenient and effective relief.
Finally, the judicial system has an interest in avoiding
piecemeal litigation in multiple forums and allowing
Plaintiff to bring all of these cases in one forum would
further this interest.

For these reasons, the court's exercise of jurisdiction
over the non-resident Individual Defendants comports with

47

the requirements of due process and Plaintiff's claims
against them will not be dismissed.

B. Individual Complaints.

   1. Residential Funding Company, LLC, et al. (11-30035-MAP).

   For the reasons discussed earlier, the court will
dismiss Plaintiff's claim of misstatements or omissions
regarding owner-occupancy rates.  The court will dismiss the
section 410(a) claims against the non-underwriter
Defendants: Residential Funding Company, LLC; Residential
Accredit Loans, Inc.; Residential Asset Mortgage Products,
Inc.; Residential Asset securities Corporation; and
Residential Funding Securities, LLC.  The court will dismiss
the section 410(b) claims against Defendants whose control
person liability stems from primary violations by the non-
underwriter Defendants.  The court, however, is unable to
discern who these individuals or entities are.  Defendants
will have until two weeks from the date of this memorandum
to file a status report establishing the identities of the
non-underwriter control person Defendants.  The court will
deny Defendants' motion in all other respects.

2. <u>DB Structured Products, Inc., et al. (11-30039-MAP)</u>.

The court will dismiss Plaintiff's claim of misstatements or omissions regarding owner-occupancy rates. The court will dismiss the section 410(a) claims against the non-underwriter Defendants: DB Structured Products, Inc.; Deutsche Alt-A Securities, Inc.; and ACE Securities Corp. The court will dismiss the section 410(b) claims against Defendants whose control person liability stems from primary violations by the non-underwriter Defendants: Anilesh Ahuja, Jeffrey Lehocky, Michael Commaroto, Joseph Rice, Richard D'Albert, Richard Ferguson, Douglas Johnson, Evelyn Echevarria, and Julia Johnson.  The court will deny Defendants' motion in all other respects.

3. <u>RBS Financial Products Inc., et al. (11-30044-MAP)</u>.

The court will dismiss Plaintiff's claim of misstatements or omissions regarding owner-occupancy rates. The court will dismiss the section 410(a) claims against the non-underwriter Defendants: RBS Financial Products, Inc.; RBS Acceptance Inc.; and Financial Asset Securities Corp. The court will dismiss the section 410(b) claim against John C. Anderson, whose control person liability stems from

49

primary violations by a non-underwriter Defendant.  The court will deny Defendants' motion in all other respects.

    4. <u>DLJ Mortgage Capital, Inc., et al. (11-30047-MAP)</u>.

    The court will dismiss Plaintiff's claim of misstatements or omissions regarding owner-occupancy rates. The court will dismiss the section 410(a) claims against the non-underwriter Defendants: DLJ Mortgage Capital, Inc. and Credit Suisse First Boston Mortgage Securities Corp.  The court will dismiss the section 410(b) claims against Defendants whose control person liability stems from primary violations by the non-underwriter Defendants: DLJ Mortgage Capital Inc., Andrew A. Kimura, Jeffrey A. Altabef, Evelyn Echevarria, Michael A. Marriott, and Thomas Zingalli.  The court will deny Defendants' motion in all other respects.

    5. <u>Credit Suisse First Boston Mortgage Securities Corp., et al. (11-30048-MAP)</u>.

    The court will dismiss Plaintiff's claim of misstatements or omissions regarding owner-occupancy rates. The court will dismiss Plaintiff's claims against the non-underwriter Defendants: Credit Suisse First Boston Mortgage Securities Corp.; DLJ Mortgage Capital, Inc.; Mortgage Asset

Securitization Transactions, Inc.; and UBS Real Estate
Securities Inc.  The court will dismiss the claims against
Defendants whose control person liability stems from primary
violations by the non-underwriter Defendants: UBS Real
Estate Securities Inc., Andrew A. Kimura, Jeffrey A.
Altabef, Evelyn Echevarria, Michael A. Marriott, Thomas
Zingalli, David Martin, Per Dyrvik, and Peter Slagowitz.
The court will deny Defendants' motion in all other
respects.

    6. <u>JP Morgan Chase Bank, N.A., et al. (11-30094-MAP)</u>.

    The court will dismiss Plaintiff's claim of
misstatements or omissions regarding owner-occupancy rates.
The court will dismiss the section 410(a) claims against the
non-underwriter Defendants: J.P. Morgan Mortgage Acquisition
Corp.; J.P. Morgan Acceptance Corporation I; J.P. Morgan
Chase Bank, N.A.; EMC Mortgage Corporation; Cohen Legacy,
LLC; Structured Asset Mortgage Investments II Inc.; Bear
Stearns Asset Backed Securities I LLC; Washington Mutual
Mortgage Securities Corporation; and WaMU Asset Acceptance
Corporation.  The court will dismiss the section 410(b)
claims against Defendants whose control person liability

stems from primary violations by the non-underwriter Defendants.  The court is unable to discern who these individuals or entities are. Defendants will have until two weeks from the date of this memorandum to file a status report establishing the identities of these Defendants.

Defendants in this case have made additional arguments for dismissal of the claims against J.P. Morgan Chase Bank, N.A. and Cohen Legacy, LLC.  These arguments do not need to be addressed because both Defendants are non-underwriter Defendants, and the claims against them will be dismissed for the reasons discussed earlier.

The court will deny Defendants' motion in all other respects.

7. <u>Goldman Sachs Mortgage Company, et al. (11-30126-MAP)</u>.

The court will dismiss Plaintiff's claim of misstatements or omissions regarding owner-occupancy rates. The court will dismiss the section 410(a) claims against the non-underwriter Defendants: Goldman Sachs Mortgage Co.; Bear Stearns Asset Backed Securities I LLC; American Home Mortgage Securities LLC; and American Home Mortgage Assets

LLC.  The court will dismiss the section 410(b) claims
against Defendants whose control person liability stems from
primary violations by the non-underwriter Defendants.  The
court is unable to discern who these individuals or entities
are.  Defendants will have until two weeks from the date of
this memorandum to file a status report establishing the
identities of these Defendants.  The court will deny
Defendants' motion in all other respects.

     8. Impac Funding Corporation, et al. (11-30127-MAP).

     The court will dismiss Plaintiff's claim of
misstatements or omissions regarding owner-occupancy rates.
The court will dismiss the section 410(a) claims against the
non-underwriter Defendants: Impac Funding Corp. and Impac
Secured Assets Corp.  The court will dismiss the section
410(b) claims against Defendants whose control person
liability stems from primary violations by the non-
underwriter Defendants.  The court is unable to discern who
these individuals or entities are.  Defendants will have
until two weeks from the date of this memorandum to file a
status report establishing the identities of these
Defendants.  The court will deny Defendants' motion in all

other respects.

9. HSBC Bank USA, National Association, et al. (11-30141-MAP).

This final complaint presents a unique issue that must now be addressed.  It appears that the offering documents at issue in this case did not include a disclosure that the owner-occupancy rates were based on the borrowers' representations of their intended use.  A review of the offering documents submitted by Defendants did not uncover any such disclosure.  Moreover, in their memorandum in support of the motion to dismiss, Defendants stated that the offering documents do not identify the methodology through which owner-occupancy rates were derived.  Because the offering documents appear to lack the disclosure present in the other eight cases, the earlier discussion of owner-occupancy rates does not apply here.

Defendants argue that the claim regarding owner-occupancy rates should nevertheless be dismissed.  According to Defendants, Plaintiff's forensic review that determined owner-occupancy rates were lower than those represented by Defendants is irrelevant.  While Plaintiff may believe that

its methodology is more accurate, Defendants argue that,
because Defendants did not state that their representations
were based on the same methodology, the fact that the two
differ does not show any misrepresentation on Defendants'
part.

This argument is unconvincing.  The offering documents
in this case did not state that the rates were based on
borrowers' representations or that they represented the
results of a particular methodology.  They stated only that
a certain percentage of properties was occupied by owners.
If the actual owner-occupancy rate was different from that
represented by Defendants, Defendants' made a
misrepresentation.  Plaintiff alleges, based on a forensic
analysis, that this was the case.  Defendant may question
the accuracy of Plaintiff's forensic analysis, but this is a
question of fact that cannot be determined at this stage of
the proceedings.  For these reasons, Plaintiff's claim
regarding the owner-occupancy rates will not be dismissed in
this case.

The court will dismiss Plaintiff's section 410(a) claims
against the non-underwriter Defendants: HSBC Bank USA,

National Association and HSI Asset Securitization

Corporation.  The court will dismiss the section 410(b)

claims against Defendants whose control person liability

stems from primary violations by the non-underwriter

Defendants.[15]  The court is unable to discern who these

_____

[15] Defendants do not explicitly raise the issues
concerning non-underwriter Defendants and control person
liability in their motion to dismiss.  The only argument
that Defendants explicitly put forth in support of their
motion to dismiss is that Plaintiff failed to allege any
actionable misstatement or omission, for reasons similar to
those raised in the other motions to dismiss.  However,
Defendants attempt to adopt, to the extent relevant, the
arguments set out in the joint briefs filed in the other
eight cases.

    Generally, Defendants cannot incorporate by reference
documents filed in other cases.  See Langella v. Cercone,
Civ. A. No. 09-312, 2010 WL 2402940, at *6 n.1 (W.D. Pa.
June 10, 2010) ("[Fed. R. Civ. P. 10(c)] does not provide a
legal mechanism whereby a court should consider legal
arguments raised in another party's motion to dismiss . . .
."); 5A Charles Alan Wright & Arthur R. Miller, Federal
Practice & Procedure § 1326 (3d ed. 2011) ("[A]llegations in
pleadings in another action, even if between the same
parties, cannot be incorporated by reference.").

    One reason courts are reluctant to allow this type of
incorporation by reference is that "it is not [the] Court's
responsibility to search another party's motion to determine
which, if any, of the arguments set forth in said motion are
applicable to a different defendant . . . ."  Langella, 2010
WL 2402940, at *6 n.1.  In this case, the court is familiar
with the filings in the other eight cases, which are
substantially similar to this case, and the usual concerns
about inferring arguments from other submissions have less

individuals or entities are.  Defendants will have until two weeks from the date of this memorandum to file a status report establishing the identities of these Defendants.  The court will deny Defendants' motion in all other respects.

IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss (11-30035-MAP (Dkt. Nos. 22 and 28); 11-30039-MAP (Dkt. No. 17); 11-30044-MAP (Dkt. No. 17); 11-30047-MAP (Dkt. No. 16); 11-30048-MAP (Dkt. Nos. 23 and 27); 11-30094-MAP (Dkt. No. 24); 11-30126-MAP (Dkt. No. 26); 11-30127-MAP (Dkt. No. 10); 11-30141-MAP (Dkt. No. 11)) are hereby ALLOWED in part and DENIED in part.  Plaintiff's claims regarding misrepresentations concerning owner-occupancy rates are dismissed in all of the complaints, except in the complaint against HSBC Bank USA, National Association et al. (11-30141-MAP).  Plaintiff's section 410(a) claims against

---

force.

At the least, the arguments on which the court will grant the motions to dismiss in the other eight cases -- the definition of a statutory seller and control person liability for non-underwriter Defendants -- do apply here. Consequently, the court will consider these arguments from the joint motions incorporated by reference here.

57

the non-underwriter Defendants are dismissed in all of the complaints.  These Defendants are identified in Part III, Section B of this memorandum and order.  Plaintiff's section 410(b) claims against Defendants whose control person liability stems from primary violations by non-underwriter Defendants are also dismissed.  Some of these Defendants are identified in Part III, Section B of this memorandum.  The court is unable to identify these Defendants in the actions numbered 11-30035-MAP, 11-30094-MAP, 11-30126-MAP, 11-30127-MAP, and 11-30141-MAP.  Defendants in these actions have until two weeks from the date of this memorandum to file a status report naming the relevant Defendants.

Defendants should now file Answers within twenty days. The cases will then be referred to Magistrate Judge Kenneth P. Neiman for a pretrial scheduling conference.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

58