UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>RESIDENTIAL FUNDING COMPANY,<br>LLC, et al.,<br><br>    Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 11-30035-MGM |
| MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>DB STRUCTURED PRODUCTS, INC., et al.,<br><br>    Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 11-30039-MGM |
| MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>RBS FINANCIAL PRODUCTS INC., et al.,<br><br>    Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 11-30044-MGM |
| MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>    v. | *<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 11-30047-MGM |

| | | |
|---|---|---|
| DLJ MORTGAGE CAPITAL, INC., et al., | * | |
| | * | |
| Defendants. | * | |

| | | |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30048-MGM |
| CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al., | * * * | |
| Defendants. | * | |

| | | |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30094-MGM |
| J.P. MORGAN SECURITIES LLC, et al., | * * | |
| Defendants. | * | |

| | | |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30126-MGM |
| GOLDMAN SACHS MORTGAGE COMPANY, et al., | * * * | |
| Defendants. | * | |

| | | |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |

|  |  |  |
|---|---|---|
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 11-30127-MGM |
| IMPAC FUNDING CORPORATION, et al., | * | |
| | * | |
| Defendants. | * | |

|  |  |  |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30141-MGM |
| HSBC BANK USA, NATIONAL ASSOCIATION, et al., | * * * | |
| Defendants. | * | |

|  |  |  |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30215-MGM |
| COUNTRYWIDE FINANCIAL CORPORATION, et al., | * * * | |
| Defendants. | * | |

|  |  |  |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 11-30285-MGM |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. et al., | * * * | |
| Defendants. | * | |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT
11-30035-MGM (Dkt. No. 251); 11-30039-MGM (Dkt. No. 280); 11-30044-MGM (Dkt. No. 270);
11-30047-MGM (Dkt. No. 255); 11-30048-MGM (Dkt. No. 287); 11-30094-MGM (Dkt. No. 352);
11-30126-MGM (Dkt. No. 333); 11-30127-MGM (Dkt. No. 237); 11-30141-MGM (Dkt. No. 231);
11-30215-MGM (Dkt. No. 345); 11-30285-MGM (Dkt. No. 360)

October 29, 2014

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

Massachusetts Mutual Life Insurance Company ("Plaintiff") filed eleven related actions against various defendants ("Defendants"),[1] asserting violations of the Massachusetts Uniform Securities Act ("MUSA"), Mass. Gen. Laws ch. 110A, § 410, for misstatements and omissions contained in the offering documents of residential mortgage-backed securities ("RMBS"). Presently before the court are Plaintiff's motions for partial summary judgment, filed in all eleven cases, in which it seeks to preclude Defendants from asserting a "loss causation" affirmative defense. For the following reasons, the court agrees with Plaintiff that a loss causation affirmative defense is not available and that it is appropriate for the court to resolve the issue at this stage. Accordingly, the court will allow Plaintiff's motions for partial summary judgment.

II. BACKGROUND

Plaintiff explained in its Local Rule 56.1 Statement of Uncontested Material Facts that "there are no material facts that relate to its Motion for Partial Summary Judgment of Defendants' Loss Causation Defense" because "[t]he Motion raises a pure question of law."[2] (11-30035-MGM, Dkt.

---

[1] Defendants include the eleven above-captioned corporate defendants as well as thirty-three individual defendants.
[2] In opposing Plaintiff's motions, Defendants state that they "do not necessarily agree with" Plaintiff's Local Rule 56.1 Statement and, elsewhere in their brief, include deposition testimony from Plaintiff's employees allegedly showing that a loss causation defense would be "fatal" to Plaintiff's claims. (11-30035-MGM, Dkt. No. 264, Defs.'s Opp'n to Pl.'s Mot. for Partial Summ. J., at 18 & n.15.) The court, however, agrees with Plaintiff that this additional evidence is not properly before the court because Defendants failed to submit their own Statement of Material Facts, as required by Local Rule

No. 252, Pl.'s Statement of Uncontested Material Facts Pursuant to Local Rule 56.1.) In any event, the following background, largely taken from Judge Ponsor's ruling on Defendants' motions to dismiss, provides context for the present dispute.

> These actions arise out of the sale of RMBS certificates between 2005 and 2007. All of the certificates at issue were created in a largely identical multi-step securitization process. Loan originators originated mortgage loans to borrowers who were buying or refinancing homes. A sponsor bought loans from the originators and aggregated them into a loan pool, which usually contained thousands of loans. The sponsor then sold the pool to a depositor, who transferred the loans to a trust. The trust issued certificates to the depositor, who sold the certificates to the underwriting financial institutions for resale to investors, such as Plaintiff. Defendants in these actions include institutions that served as sponsors, depositors, and underwriters of the loans.
>
> When sold, certificates were accompanied by offering documents that included a prospectus and prospectus supplement. The offering documents provided descriptions of the certificates, summary loan information on the underlying loans, and summary descriptions of the third-party originators' loan underwriting guidelines. Plaintiff alleges that the offering documents at issue in these cases misstated or omitted certain material facts . . . .

Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC, 843 F. Supp. 2d 191, 198 (D.Mass. 2012). Specifically, Plaintiff alleged, as to one category of misstatements, that "Defendants represented that the loans were underwritten using prudent underwriting standards, but, in fact, loan originators systematically disregarded their stated loan underwriting guidelines." Id.

Plaintiff brought these eleven actions in 2011, seeking to rescind the RMBS purchases under Section 410 of the MUSA. On February 14, 2012, Judge Ponsor granted in part and denied in part Defendants' motions to dismiss.[3] As relevant for present purposes, Judge Ponsor explained in his ruling that

---

56.1. Regardless, evidence purportedly showing the merits of a loss causation defense as a factual matter is irrelevant to whether such a defense is available as a matter of law under the MUSA.

[3] Specifically, Judge Ponsor dismissed the claims of misstatements or omissions regarding owner-occupancy rates, the section 410(a) claims against non-underwriter Defendants, and the section 410(b) claims against Defendants whose control liability stemmed from primary violations by the non-underwriter Defendants, but denied the motions to dismiss in all other respects. Id. at 197-98, 204-207, 215. Although the ruling only addressed nine of the eleven cases, the parties subsequently stipulated to apply it to the two remaining cases. (11-30215-MGM (Dkt. No. 101); 11-30285-MGM (Dkt. No. 27).)

> [t]o state a claim under MUSA section 410(a), Plaintiff must show that (1) Defendants offered or sold securities in Massachusetts; (2) by making an untrue statement of, or omitting, any material fact; (3) Plaintiff did not know of the untruth or omission; and (4) Defendants knew or should have known of the untruth or omission. Marram [v. Kobrick Offshore Fund, Ltd., 809 N.E2d 1017, 1026 (Mass. 2004)]. Plaintiff does not need to prove negligence, scienter, reliance, or loss causation. Id. at 1026-27. Furthermore, the buyer's sophistication is irrelevant to a MUSA claim, and the buyer has no duty to investigate or verify a statement's accuracy. Id. at 1027.

Massachusetts Mut., 843 F. Supp. 2d at 200. As to Plaintiff's allegations regarding the underwriting guidelines, Judge Ponsor held that the complaints adequately alleged "wholesale abandonment of underwriting standards" sufficient to overcome certain disclosures contained in the offering documents which might otherwise defeat Plaintiff's claims of material misstatements: "Plaintiff has alleged in each of the complaints a widespread abandonment of underwriting guidelines by these specific Defendants and poor performance of the loans." Id. at 202 (citing Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773-74 (1st Cir. 2011)). In response to Defendants' argument that "the poor performance of the loans is due solely to the economic downturn," Judge Ponsor explained that "this is a question of fact that cannot be resolved on a motion to dismiss." Id.

Following Judge Ponsor's ruling on the motions to dismiss, Plaintiff filed motions to strike various affirmative defenses asserted in Defendants' answers to the complaints. On October 17, 2012, Judge Neiman granted Plaintiff's motions to strike in part and denied them in part. In re Massachusetts Mut. Life Ins. Company's Motions to Strike, 2012 WL 5077642 (D.Mass. Oct. 17, 2012). One of the affirmative defenses Plaintiff sought to strike was loss causation. Judge Neiman, however, declined to strike the defense, explaining that "[i]t is simply too early to decide that this affirmative defense is barred." Id. at *4.[4]

---

[4] Judge Neiman's ruling on the motions to strike only applied to nine of the eleven cases. Judge Ponsor, however, made reciprocal rulings in the remaining cases. (11-30215-MGM (Dkt. No. 129); 11-30285-MGM (Dkt. Nos. 109 and 110).)

### III. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. Mendes v. Medtronic, Inc., 18 F.3d 13, 15 (1st Cir. 1994) (discussing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Moreover, a party may move for partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."); Advisory Committee Notes on 2010 Amendments to Fed.R.Civ.P. 56(a) ("The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but as to a claim, defense, or part of a claim or defense.").

### IV. ANALYSIS

Plaintiff argues that Defendants are barred, as a matter of law, from asserting a loss causation affirmative defense. In support, Plaintiff contends that a loss causation affirmative defense is incompatible with the plain language of the MUSA, and Massachusetts case law makes clear that loss causation is irrelevant, as does case law interpreting similar statutes in other states. Plaintiff additionally argues that such a defense is inconsistent with the remedy of rescission provided by the MUSA, and the history of the MUSA, when compared with federal securities law,

confirms that it is unavailable. In response, Defendants argue that while loss causation is not an element plaintiffs must prove, it can be asserted by defendants as an affirmative defense. Defendants contend that an amendment to federal securities law clarified that a loss causation defense was always available and the MUSA should be interpreted in coordination with federal law. Defendants further assert that a loss causation defense is not inconsistent with the remedy of rescission, most states have not decided whether a loss causation defense is available under similar laws, and the plain language of the MUSA does not preclude a loss causation defense. Finally, Defendants urge the court not to decide the issue at this time.

As an initial matter, it is clear that this issue – whether loss causation is available as an affirmative defense – has not yet been resolved in these cases. As Defendants explain, Judge Ponsor's statement that "Plaintiff does not need to prove negligence, scienter, reliance, or loss causation," Massachusetts Mut., 843 F. Supp. 2d at 200, merely addressed elements a plaintiff need not prove without resolving the affirmative defense issue.[5] In addition, Judge Ponsor's statement that "this is a question of fact that cannot be resolved on a motion to dismiss," id. at 202, also addressed Plaintiff's burden to prove its case and not a possible affirmative defense Defendants may assert. Plaintiff had alleged, in support of its allegation that Defendants misstated material facts with regard to the underwriting guidelines, that the poor performance of the loans could only be explained by widespread abandonment of underwriting standards. Id. at 200. Accordingly, while Judge Ponsor intimated that Defendants may be able to attempt to rebut Plaintiff's material misstatement claim as to the underwriting standards by showing that the economic downturn caused

---

[5] Similarly, many of the cases cited by Plaintiff only address whether a plaintiff must prove loss causation, not whether a defendant may assert a loss causation affirmative defense. Clearly, however, an element a plaintiff does or does not have to prove is distinct from an affirmative defense that a defendant would have the burden to prove. See, e.g., I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 37 (1st Cir. 1998) ("[T]his court has not previously decided whether a showing of non-functionality is an element of the claim of the party seeking protection, or whether functionality is an affirmative defense on which the defending party has the burden."). Thus, although perhaps relevant to the availability of a loss causation affirmative defense, many of the cases cited by Plaintiff are not directly on point.

8

the poor loan performance, he did not indicate that Defendants may assert a free-standing loss causation affirmative defense.

In ruling on Defendants' motions to strike, Judge Neiman explicitly declined to resolve the loss causation issue. See In re Massachusetts Mut. Life Ins. Company's Motions to Strike, 2012 WL 5077642, at *4. As Judge Neiman explained, he agreed "with Defendants that, to the extent [Marram, 809 N.E.2d at 1025] stands for the proposition that a plaintiff need not prove the cause of its loss, does not necessarily mean that a lack of causation is not an affirmative defense." Id. at *3. This court, as mentioned, agrees that a plaintiff not being required to prove an element does not necessarily equate to the preclusion of an affirmative defense. By qualifying his statement with the phrase "to the extent that decision stands for . . . ," Judge Neiman seems to have recognized that Marram may stand for a broader proposition.[6] This court concludes that Marram does stand for a broader proposition.

In Marram, the Supreme Judicial Court explained the general purposes of M.G.L. c. 110A, § 410(a)(2):[7] "The statute's thrust is both 'redressive' and 'preventive.'" Marram, 809 N.E.2d at 1025 (quoting Shulman, Civil Liability and Securities Act, 43 Yale L.J. 227, 227 (1933)). "It aims, of course, to compensate the buyer for a loss." Id. "More importantly," the court explained, "it creates a strong incentive for sellers of securities to disclose fully all material facts about the security.

---

[6] Judge Neiman also indicated earlier in his decision that he was reluctant to preclude an affirmative defense at the motion to strike stage if the issue was unclear. See id. at *1, 3.

[7] The statute provides that
> [a]ny person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make that statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition.

MASS. GEN. LAWS ch. 110A, § 410(a)(2).

Section 410(a)(2) 'provide[s] a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser,' <u>regardless of the actual cause of the investor's loss</u>." <u>Id</u>. (emphasis added) (quoting <u>Casella v. Webb</u>, 883 F.2d 805, 809 (9th Cir. 1989)). Contrary to Defendants' argument, the court does not read this statement as merely describing a plaintiff's burden (or lack thereof) to prove its claim.

The <u>Marram</u> opinion used direct and specific language, explaining that tainted transactions are voidable "regardless of the actual cause of the investor's loss." <u>Id</u>. Thus, on its face, the statement seemingly applies to both a plaintiff's burden to prove its case and a defendant's possible affirmative defense, <u>i.e.</u>, that loss causation is simply irrelevant regardless of whether its existence can be proven by a plaintiff or its non-existence can be proven by a defendant. Put another way, if a defendant were allowed to assert a loss causation affirmative defense and was successful, then the transaction would not be voidable "<u>regardless</u> of the actual cause of the investor's loss." Moreover, the statement appears in the portion of the decision discussing the MUSA's general purposes, not in the subsequent discussion of a plaintiff's burden to prove the <u>prima facie</u> elements of its claim. <u>See id.</u> at 1025-27.

The citations directly following the "regardless" statement in <u>Marram</u> also support a broader reading than Defendants suggest. The court cited Kaminsky, <u>An Analysis of Securities Litigation under Section 12(2) and How it Compares with Rule 10b-5</u>, 13 Hous. L.Rev. 231, 239 (1979), quoting the following in a parenthetical:

> [Section] 12[2] [of the federal Securities Acts of 1933] is designed to induce sellers to be assiduous in insuring full disclosure to the buyer by threatening the seller with liability almost as an insurer in the event that there has been any material inaccurate disclosure or nondisclosure in the sale traceable in any way to the seller's carelessness or affirmative wrongdoing.

<u>Id.</u> In addition, the <u>Marram</u> court cited J.C. Long, <u>Blue Sky Law</u> § 9:24, at 9-38, quoting the following in a parenthetical: "The Securities Act was intended to reverse the age-old concept of

caveat emptor and replace it with the concept of caveat venditor or seller beware." Id. Moreover, the Casella case quoted in Marram explained that "[s]ection 12(2) 'is a broad anti-fraud measure' . . . intended to provide a heightened deterrent against sellers who make misrepresentations by rendering tainted transactions voidable at the option of the defrauded purchaser <u>regardless of whether the loss is due to the fraud or to a general market decline</u>." Casella, 883 F.2d at 808-809 (emphasis added; citation omitted). In support of this statement, the Ninth Circuit, in turn, cited Randall v. B.J. Loftsgaarden, 478 U.S. 647, 659 (1986), in which the Supreme Court explained, also regarding Section 12(2) of the Securities Act of 1933, that "by enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to the defendants, <u>whether or not that decline was actually caused by the fraud</u>." Id. (emphasis added). In support of this statement, the Supreme Court cited Thompson, The Measure of Recovery under Rule 10b-5: A Restitution Alternative to Tort Damages, 37 Vand.L.Rev. 349, 369 (1984), which stated:

> Rescission thus has an obvious advantage over out of pocket recovery because it permits a plaintiff to shift the risk of a declining market to the defendant. Consider the following hypothetical: Defendant misrepresents that certain stock possesses qualities that make it worth $10 more per share than it would be worth without those qualities and plaintiff purchases the stock, relying on the misrepresentation. After discovering the fraud, plaintiff will want to recover for the amount attributable to the fraud and can do so under an out of pocket measure. If, however, plaintiff discovers the fraud after world events have driven down the price of all stocks, the plaintiff can choose to unwind the sale, return the depreciated stock, and receive back undepreciated cash, <u>recovering not only the loss caused by the misrepresentation, but also the loss caused by the decline in the market</u>.

Id. (emphasis added.) Accordingly, the statement in Marram that a tainted transaction is voidable "regardless of the actual cause of the investor's loss," especially when read in the context of the cases and secondary sources directly and indirectly referenced therein, strongly indicates that a loss causation affirmative defense is not available under section 410(a)(2) of the MUSA.

11

Importantly, Section 12(2) of the federal Securities Act of 1933, codified at 15 U.S.C. § 77l, on which the MUSA was modeled and which many of the sources cited in Marram addressed, was amended in 1995 by the Private Securities Litigation Reform Act ("PSLRA") to specifically include a loss causation affirmative defense. See Pub. L. No. 104-67, § 105, codified at 15 U.S.C. § 77l(b). The parties, of course, interpret the amendment's effect on the MUSA in different ways. Plaintiff argues that the amendment confirmed that prior to 1995 a loss causation affirmative defense was not available under Section 12(2) and, because the MUSA has not similarly been amended, it does not include such a defense. Defendants, on the other hand, argue that the PSLRA merely "clarified" that a loss causation affirmative defense has always been available under Section 12(2), relying on a Senate Report which stated that the law was being amended "to clarify that defendants may raise the absence of 'loss causation' as an affirmative defense." S. Rep. No. 104-98, at 23 (1995). Accordingly, Defendants argue, the MUSA, which should be read "in coordination" with Section 12(2), Marram, 809 N.E.2d at 1025, also has always included a loss causation affirmative defense.

The Defendants' interpretation of the prior version of Section 12(2) lacks support in case law. The one case Defendants cite, Wilson v. Ruffa & Hanover, P.C., 844 F.2d 81 (2d Cir. 1988), vacated on reargument, sub. nom. Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124 (2d Cir. 1989), addressed the potential liability of non-selling collateral participants under Section 12(2), holding that even if the defendant was not an offeror or seller of securities, it could still be liable if the plaintiff proved loss causation. Id. at 84-86. The Second Circuit did not state that loss causation was an element or affirmative defense as to direct claims against offerors, sellers, or those who control them, and those are the direct claims at issue in these cases as alleged by Plaintiff.[8] In fact, the Second Circuit recognized that Section 12(2) provided a remedy of rescission for claims

---

[8] Judge Ponsor dismissed the claims against the non-underwriter Defendants because Plaintiff failed to adequately allege that they were offerors or sellers of securities, as required by both the MUSA and Section 12(2). See Massachusetts Mut. Life Ins. Co., 843 F. Supp. 2d at 205-07.

12

against actual offerors or sellers "and thus compensates for all losses, whether or not caused by the misstatement." Id. at 84. Later in the decision, the Second Circuit explained:

> We do not mean to suggest, of course, that plaintiffs must demonstrate loss causation or transaction causation in suits against actual sellers or those who control them. In drafting Section 12(2), Congress obviously sought to provide a heightened deterrent against sellers who make misrepresentations, by rendering tainted transactions voidable at the option of the defrauded purchaser regardless of whether the loss is due to the fraud or to a general market decline. Yet this heightened deterrent is expressly directed only at actual sellers and those who control them. We recognized this fact when, in extending the scope of Section 12(2) beyond its plain terms to collateral participants, we required that scienter must be proven as to them although a showing of negligence would suffice as to sellers. Lanza v. Drexel & Co., 479 F.2d [1277, 1298 (2d Cir. 1973)]. For similar reasons, we believe that a showing of loss causation is necessary to hold collateral participants liable under Section 12(2).[9]

Id. at 86 (emphasis in original). Following Pinter v. Dahl, 486 U.S. 622, 650-51 (1988), in which the Supreme Court held that non-selling collateral participants could not be held liable under Section 12(1), the Second Circuit vacated its original decision in Wilson but reached the same result on the ground that the defendant was not an offeror or seller under Section 12(2). See Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d at 1127. Defendants, therefore, have not cited or relied on any case which interprets the pre-1995 version of Section 12(2) in the manner they suggest.

This court is not persuaded that loss causation has always been technically available due to the use of the word "clarify" in the Senate Report. Even assuming that the word was intended to signify a retrospective interpretation of the statute, rather than merely describing a prospective change, the views contained in a Senate Report in 1995 shed no light on the intent of the 1933 Congress. As the Supreme Court has explained, "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." Bruesewitz v. Wyeth

---

[9] The Second Circuit essentially imported the requirements for an implied right of action under Section 10(b) of the Securities Exchange Act of 1934 into a Section 12(2) claim against non-selling collateral participants. See id. at 86 ("We recognize that our holding renders actions against collateral participants under Section 12(2) essentially identical to actions under the 'catch-all' Section 10(b)."); see also Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d at 1127 ("In our original opinion, we held that a suit against a collateral participant under Section 12(2) had to meet the requirements of a Section 10(b) action.").

13

LLC, 131 S.Ct. 1068, 1081 (2011). "Real (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." Id. "But post-enactment legislative history by definition 'could have no effect on the congressional vote.'" Id. (quoting District of Columbia v. Heller, 554 U.S. 570, 605 (2008)). Obviously, the fact that the statement was made over sixty years after enactment renders it especially immaterial.[10] More fundamentally, as Plaintiff points out, if Section 12(2) always included a loss causation affirmative defense, then there would have been no need to amend the statute.

This conclusion – that prior to 1995, Section 12(2) did not include a loss causation affirmative defense and, thus, the MUSA does not include one either – finds support in two recent decisions from the Southern District of New York. In Fed. Hous. Fin. Agency v. HSBC North Am. Holdings Inc. ("FHFA"), 988 F. Supp. 2d 363 (S.D.N.Y. 2013), a decision regarding multiple related actions, the court addressed at the summary judgment stage whether the Virginia and Washington D.C. securities statutes, which are substantially similar to the MUSA, provide a loss causation defense. The court first explained that, unlike the current version of Section 12(2), "neither the Virginia nor the D.C. Blue Sky law explicitly contain a loss causation defense." Id. at 367. Similar to § 410(a)(2) of the MUSA, the "only two defenses explicitly provided [under the Virginia law] absolve a defendant of liability if the purchaser knew of the 'untruth or omission' at issue or if the defendant proves that 'he did not know, and in the exercise of reasonable care could not have know, of such untruth or omission.'" Id. at 368 (quoting Va.Code Ann. § 13.a-522(A)); see also Marram, 809 N.E.2d at 1027-28 (identifying the same two affirmative defenses under the MUSA). The court also

---

[10] Defendants also point to a 1933 article in the New York Times written by the Chief of the FTC's Securities Division, as well as a statement made by the FTC Commissioner in 1934, in further support of their interpretation of Section 12(2). Plaintiff asserts that these sources do not support Defendants' reading of the statute. In any event, these are also post-enactment sources which provide little, if any, insight into the views of Congress in enacting the legislation. See id. More importantly, Defendants have not identified, and the court cannot find, any case law relying on these sources or interpreting Section 12(2) as Defendants do. Thus, while the sources may be interesting, they provide no authority and, therefore, the court will not rely on them.

14

explained that the defendants did not cite any Virginia case law interpreting the statute as including a loss causation defense.  FHFA, 988 F. Supp. 2d at 368.  "Moreover," the court explained, "as FHFA observes, a loss causation defense would be somewhat at odds with the statute's rescission remedy, which allows a plaintiff to essentially return the security for the full purchase price, without any reduction based on intervening and unrelated changes in the security's value." Id.  The court then addressed the defendants' argument that the PSLRA "clarified that [a loss causation defense] had always been part of the law" and therefore the Virginia law should be interpreted similarly.  Id. (emphasis in original).  "First, and perhaps most critically," the court explained, "the '33 Act did not include a loss causation defense before the enactment of the PSLRA."  Id. (citing Randall, 478 U.S. at 659; Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d at 1126).  The court also found that the defendants' reliance on the Senate Report "is a meagre thread on which to hang an argument.  There is no justification for treating the Senate's use of the term 'clarify' in 1995 as a controlling interpretation of the meaning of the Securities Act of 1933."  Id. at 369.  Accordingly, the court held that there was no basis to believe that Virginia courts would incorporate the changes to Section 12(2) into the state law.  Id.  The court reached the same conclusion with regard to the D.C. law, which, like the MUSA, is also based on the Uniform Securities Act.  Id. at 369-70.  In addition, in Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc., 2014 WL 1673351 (S.D.N.Y. April 18, 2014), the Southern District of New York similarly held that the Illinois and Texas securities laws did not include loss causation defenses.  Id. at *3-7.  The court finds these two decisions persuasive.

Accordingly, while Defendants are correct that courts construing the MUSA should look to federal law for guidance, it is unreasonable to conclude that a provision explicitly contained in the federal statute but missing from the state statute should nonetheless govern the latter.  See Marram, 809 N.E.2d at 1025 ("[W]e look to Federal decisions under § 12(2), as well as to the plain language

of the statute and decisions of our appellate courts, for our interpretation of G.L. c. 110A, § 410(a)(2)." (emphasis added)). As Plaintiff points out, when the language of Section 12(2) and the MUSA conflict, courts have not hesitated to construe the two differently. See, e.g., Fed. Home Loan Bank of Boston v. Ally Fin., Inc., 2013 WL 5466631, at *5 (D.Mass. Sept. 30, 2013) ("Although coordination between the federal and state securities statutes is desirable, . . . here the plain language of the state statute makes clear that is this respect the scope of the state statute is broader than that of the federal statute. The state statute makes no reference to a prospectus and imposes liability on any person who offers or sells a security by means of any untrue statement of a material fact or omission." (citation and internal quotation marks omitted)).

Defendants contend that, contrary to Plaintiff's argument, the plain language of the MUSA does not prohibit a loss causation defense. The court agrees with Plaintiff, however, that the explicit inclusion of two affirmative defenses in § 410(a)(2) implies that a loss causation defense is not available. See Marram, 809 N.E.2d at 1027-28. Granted, Defendants argue that other courts have permitted affirmative defenses which were not explicitly contained in securities statutes. That may be so, but it does nothing to explain why a loss causation defense should be available here.[11] Similarly, although Defendants argue that courts "should not accept the literal meaning of the words of a statute without regard for that statute's purpose and history," Sterilite Corp. v. Continental Cas. Co., 494 N.E.2d 1008, 1010 (Mass. 1986), they have not shown how preclusion of a loss causation defense is inconsistent with the purpose and history of the MUSA. If anything, such preclusion

---

[11] Defendants also argue that loss causation was a defense at common law and thus was subsumed within the rescission remedy in both Section 12(2) and the MUSA, whereas Plaintiff argues that loss causation was irrelevant at common law. Compare 1 Henry Campbell Black, et al., A Treatise on the Rescission of Contracts and Cancellation of Written Instruments § 68 (2d ed. 1929) (explaining that "[t]he essential elements of a fraudulent misrepresentation, justifying rescission," include the requirement that the misrepresentation resulted in "loss, damage, or injury to him [that] must be shown as a consequence of it"); with 12A Long, Blue Sky Law § 9:117.39 (2014) ("[L]oss causation never was a part of common law rescission."). The court is more convinced by Plaintiff's argument, at least as it pertains to Massachusetts common law. See Reisman v. KPMG Peat Marwick LLP, 787 N.E.2d 1060, 1074 (Mass.App.Ct. 2003) (explaining that loss causation is irrelevant in claims of common law fraud). In any event, even if the court were convinced by Defendants' argument regarding loss causation at common law, they have not demonstrated that such a defense was automatically incorporated into either Section 12(2) or the MUSA.

seems entirely consistent with the purpose and history of the statute, as explained in Marram. See Marram, 809 N.E.2d at 1025-26.[12]

Lastly, the court is not convinced that it should defer ruling on this issue. Defendants suggest the court should wait until at least jury instructions when they will request the court allow the defense to go to the jury. This approach, Defendants assert, would save judicial resources because, if the court were reversed on appeal for improperly permitting a loss causation defense, there would be no need for a new trial. Rather, Defendants explain, the court could simply excise that portion of the special verdict form which reduced Plaintiff's recovery commensurate with a successful loss causation defense. The court concludes, however, that Defendants' approach is much less efficient. Contrary to Defendants' argument, judicial resources are not saved by permitting a complex issue to remain lurking in these cases when the court is convinced that the Supreme Judicial Court would not recognize this defense. Moreover, these cases are distinguishable from Cohesive Technologies v. Waters Corp., 130 F. Supp. 2d 157 (D.Mass. 2001), upon which Defendants rely. Unlike the issue in that case, the loss causation question does not represent a "disputable legal issue of first impression," in which "the legal theory advanced by the movant is supported not by existing law but by a reasonable argument for extension or modification of existing law." Id. at 160. In contrast, as explained, the court believes that Marram addresses this issue. Moreover, two recent cases out of the Southern District of New York persuasively resolved this exact issue under similar statutes, in response to the same arguments regarding Section 12(2). In addition, the court concludes, it is entirely appropriate to decide this issue at this time. The issue has

---

[12] Indeed, the Senate Report Defendants rely on disapproved of the result, absent loss causation, that "issuers have been put in the position of insuring shareholders and purchasers against normal market risk." S. Rep. No. 104-98, at 23 (1995). This statement, however, conflicts with the suggestion in Marram that the MUSA "is designed to induce sellers to be assiduous in insuring full disclosure to the buyer by threatening the seller with liability almost as an insurer in the event that there has been any material inaccurate disclosure or nondisclosure in the sale traceable in any way to the seller's carelessness or affirmative wrongdoing." Marram, 809 N.E.2d at 1026 (quoting Kaminsky, supra, at 239).

17

been extensively briefed and argued, discovery is essentially completed, and comprehensive summary judgment motions in the cases are just ahead.

V. CONCLUSION

For these reasons, Plaintiff's motions for partial summary judgment (11-30035-MGM (Dkt. No. 251); 11-30039-MGM (Dkt. No. 280); 11-30044-MGM (Dkt. No. 270); 11-30047-MGM (Dkt. No. 255); 11-30048-MGM (Dkt. No. 287); 11-30094-MGM (Dkt. No. 352); 11-30126-MGM (Dkt. No. 333); 11-30127-MGM (Dkt. No. 237); 11-30141-MGM (Dkt. No. 231); 11-30215-MGM (Dkt. No. 345); 11-30285-MGM (Dkt. No. 360)) are ALLOWED.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge